(No. 47758.■■■■■■■■■■■)

FRED FRENCHIK *et al.*, Appellants, v. ANTHONY T. DEAN *et al.*, Appellees.

*Opinion filed January 20, 1976.*

CREBS, J., took no part.

Watson B. Tucker and Karen J. Hedlund, of Chicago (Mayer, Brown & Platt, of counsel), for appellants.

Thomas R. Meites, of Chicago, for appellees.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

The plaintiffs, Fred Frenchik, Gaetano Terranova, and Seafood Council of Illinois, Inc., filed a complaint in the circuit court of Cook County against the Illinois Department of Conservation and its Director, Anthony T. Dean, to enjoin enforcement of the Department's Administrative Order No. 78. The order, which stated that it was issued pursuant to section 1.4 of the Illinois Fish Code of 1971 (Ill. Rev. Stat. 1973, ch. 56, par. 1.4), was adopted in May, 1975, to become effective on July 1. It imposed an annual harvest quota on commercial fishing for bloater chub and yellow perch, two species of fish which are the subject of commercial fishing in Lake Michigan.

The two individual plaintiffs are full-time commercial fishermen who for many years have fished the Illinois waters of Lake Michigan for chub. The Seafood Council is an association whose members include other commercial fishermen who fish those waters, as well as Chicago area wholesalers and dealers handling fish.

While Administrative Order No. 78 sets a quota for both chub and perch, it is alleged that the major part of the catch of the individual plaintiffs is chub, and the complaint in this case relates to the chub quota alone.

The complaint was filed on June 25, 1975, five days before Administrative Order No. 78 was to become effective, and the plaintiffs moved for a preliminary injunction. The defendants voluntarily withheld implementation of the order until the motion was heard on July 22. After the hearing, the trial judge denied the plaintiffs' motion and they appealed to the Appellate Court for the First District. The appeal was brought here under Rule 302(b). This court stayed the effective date of the administrative order pending disposition of the appeal. The stay order was vacated following oral argument of the case on September 26.

Paragraphs 1 and 2 of Administrative Order No. 78 provide:

"Quota
  1. An annual harvest quota of 30,000 pounds of bloater chubs and 431,000 pounds of yellow perch will be allowed.
Limited Entry
  2. A maximum of three active full-time eligible commercial fishery crews will be permitted to fish as determined by a public lottery held by the Department of Conservation."

Succeeding paragraphs of the order establish various requirements, such as size, type and condition of equipment, past compliance with required harvest reports, and an undertaking to permit fishery biologists to obtain data as to the fish caught.

The lottery for the 1975-1976 fishing season was held shortly before the hearing on the plaintiffs' motion. The defendants divided the chub quota and the perch quota equally among the three entrants who were successful in the drawing. The president of the

corporate plaintiff, himself a commercial fisherman, and one of the individual plaintiffs were two of the three winners. Each thereby became eligible for a license entitling him to catch 10,000 pounds of chub and about 143,000 pounds of perch during the period ending March 31, 1976, the date on which licenses for resident·commercial fishermen will expire under section 5.8 of the Fish Code (Ill. Rev. Stat. 1973, ch. 56, par. 5.8).

The plaintiffs alleged in their complaint, and the defendants admit, that the 1973 catch of chub was approximately 400,000 pounds. This catch would have been shared in by the score or so of part or full-time fishermen who fish for chub in Lake Michigan. The plaintiffs assert that the total quota of 30,000 pounds would not support even a single commercial fishing operation, that there are no other species of fish available for commercial harvesting in sufficient numbers to support a profitable operation, and that the plaintiffs and other commercial fishermen will in consequence be forced to go out of business. Testimony given at the hearing on the motion for a preliminary injunction by the two individual plaintiffs and the president of the corporate plaintiff supported these allegations. The witnesses also testified that they would be unable to maintain a profitable operation on the basis of an individual share of 10,000 pounds of chub per year. The defendants ·do not dispute the hardship which the plaintiffs will suffer under the administrative order.

In its order denying plaintiff's motion for a preliminary injunction, the trial court made the following findings: "The chub in Lake Michigan are on the verge of extinction. The plaintiffs will suffer some economic injury as a result of the administrative order. Hardship will fall on the fishing resources of Illinois if the administrative order is preliminarily enjoined or tempo-

rarily restrained. Further, all present and future Lake Michigan . commercial fishermen will suffer greatly in future years if the chub become extinct."

The genesis of Administrative Order No. 78 was explained in testimony given by defendant Dean and by two expert witnesses, a fisheries research biologist and a supervisor with the Wisconsin Department of Natural Resources. The testimony was that samplings of the chub population in Lake Michigan during the years 1960 through 1972 had disclosed a drastic and continuing decline in the number of chub. In the spring of 1974 State officials in charge of conservation for Illinois, Michigan, Wisconsin, and Indiana established a group called the Lake Michigan Technical Committee to review the chub situation and to prepare recommendations. The report of the committee, made in July, 1974, concluded that a continuation of commercial fishing at its present rate would threaten the survival of the species. The committee accordingly recommended the complete closure of commercial chub fishing in all four States.

In October, 1974, defendant Dean created an Illinois group, called the Illinois Task Force, to review the matter further. This task force included representatives of the commercial fishing industry. A number of meetings and a public hearing were convened by the defendants prior to the promulgation of Administrative Order No. 78. In lieu of the quota, the defendants also considered so-called "indirect" controls, such as a limitation on the depths at which fishing operations could be conducted, but these were rejected as inadequate to the purpose at hand. The defendants did not adopt the Technical Committee's proposal for total closure, however. Instead it was decided to begin by a partial closure, with a quota set at 10% of the 1973 catch. The reason behind this decision, the defendants explain, was that if some chub fishing should continue, the

State would then be in a position at the end of the 1975-1976 season to ascertain whether the chub population was or was not responding favorably, a factor which the defendants would then take into consideration in determining what action to take for the 1976-1977 season. To further this objective Administrative Order No. 78 requires each licensee to keep records of his catch and to permit fishery biologists to obtain data on the chub caught, such as their length, weight, age and sex.

The plaintiffs make the point that the evidence failed to show that commercial fishing was the cause of the dwindling chub population. We do not find that point relevant. The defendants' expert witnesses readily conceded that the decline of the chub might be due to other causes, such as water pollution or competition from other species of fish for available food supplies. The defendants admitted as well that the decline of the chub might already have become irreversible, so that the quota would turn out to be useless. These witnesses also testified, however, that without a quota the demise of the chub was inevitable. On the basis of the surveys made and the testimony of the Department's expert witnesses, we think that the defendants were entitled in their informed judgment to take the approach to the chub problem which they did take.

The plaintiffs concede, as of course they must in the light of *People v. Walton* (1924), 314 Ill. 45, that the ownership of and title to all fish in Illinois waters is in the State, and that the General Assembly could validly eliminate chub fishing outright, as it has done with lake trout in section 4.6 of the Fish Code (Ill. Rev. Stat. 1973, ch. 56, par. 4.6). The plaintiffs argue, however, that the Fish Code withholds from the defendants the power to employ the particular technique of regulation embodied in Administrative Order No. 78. We turn, therefore, to the relevant provisions of the

Code.

Article IV of the Code, which is entitled "Commercial Fishing," contains a provision in section 4.3 (Ill. Rev. Stat. 1973, ch. 56, par. 4.3) which permits chub, yellow perch, and certain other species to be taken in Lake Michigan if certain specified types of fishing equipment are employed.

Section 4.14 (Ill. Rev. Stat. 1973, ch. 56, par. 4.14) states:

> "The provisions of Sections 4.3 through 4.13 are subject to modification in the manner provided in Sections 1.4 and 1.5."

Section 1.5 relates to the filing and distribution of administrative orders which have been adopted by the Department. It is not germane here.

Section 1.4 (Ill. Rev. Stat. 1973, ch. 56, par. 1.4) reads as follows:

> "The seasons during which fish, minnows, frogs, turtles, or mussels may be taken and the size limits and daily catch limits set out in this Act are based upon a proper biological balance and shall be regulated by administrative order.
>
> The Department may not provide for a longer season or a larger daily catch limit than is provided in this Act.
>
> The Department shall modify existing provisions, when necessary, including open seasons, size limits, and methods of taking fish from the waters of Lake Michigan under the jurisdiction of the State of Illinois, in order that the compact between the Canadian provinces and those States of the United States adjacent to the Great Lakes, including the United States and Canadian Governments, may be fulfilled in the best interests of the fisheries resources and the general public."

The plaintiffs concede that the first paragraph of section 1.4 is a grant of regulatory power to defendants, and that defendants could properly modify, and therefore reduce or even eliminate a fishing season or a

daily catch limit for a species of fish as to which the Code presently establishes a season or a catch limit. Since the Code nowhere sets out either a season or a daily or annual catch limit for chub, however, the plaintiffs contend that there is nothing in the Code for the Department to "modify." The plaintiffs contend further that even if the Code did set out a season or a catch limit for chub, the establishment of an annual quota is not a regulation of the "season" for chub fishing.

We regard the plaintiffs' construction of sections 1.4 and 4.14 of the Code as strained and articifial. The regulatory scheme exhibited by the Fish Code is a composite of limitations provided in the Code itself (such as the season when certain species may legally be taken, and limits on the size and daily catch) and such additional limitations as may be established by orders of the Department of Conservation. While it may not enlarge any seasonal or daily catch limit specified in the Code, the Department is plainly authorized to regulate commercial as well as sport fishing to the end of achieving a proper biological balance. That conclusion follows not only from the language of section 1.4 but also from section 1.10 (Ill. Rev. Stat. 1973, ch. 56, par. 1.10), which directs the Department to "take all measures necessary for the conservation, distribution, introduction, and restoration of fish ***."

The term "modification" in section 4.14 was designed to insure that the existence of a statutory limitation should not foreclose the Department from establishing a more stringent limitation by administrative order. There are many species as to which the Code imposes no seasonal, size, or catch limitation. Were we to give the Code the restricted reading urged by the plaintiffs and confine the Department to modification of those statutory limitations established in 1971, the State would be unable to deal effectively

with unanticipated changes in conditions, of which the shrinkage of the chub population is an example.

In the light of the broad regulatory powers given to the Department, we conclude that its authority is not confined to the issuance of orders which limit fishing to a specific calendar period or which impose daily, as distinguished from yearly, catch limits. It is sufficient that the quota system of Administrative Order No. 78 is reasonably designed to conserve a species of fish that is protected under the Code.

The plaintiffs' contention that to confer such a general regulatory power is an improper delegation is disposed of by our decision in *People v. Walton* (1924), 314 Ill. 45. A provision of the Fish Code then in effect empowered the Department of Agriculture, in its discretion, to designate as fish preserves certain waters in which it would be unlawful to take fish. In sustaining this provision against an attack like that made in the present case, the court observed, "It is impractical for the legislature to attempt to provide details of management and regulation in the preservation of fish and game." 314 Ill. at 47.

The plaintiffs point out that section 3.01 of the Fish Code of 1947 (Ill. Rev. Stat. 1969, ch. 56, par. 143.01) explicitly empowered the Department to "shorten or close the season" during which any species might be taken, and they argue that the absence of corresponding language in the 1971 Fish Code shows a legislative intent to withdraw that power from the Department. Our examination of the comparable sections of the two codes indicates, however, that the General Assembly intended to broaden rather than curtail the power of the Department. The 1947 act stated that the seasons, size limits, and catch limits "set out in this Act are based upon a proper biological balance *** and shall remain in effect as long as the population of each species is adequate to maintain the

biological balance of each species." The authority of the Department to "shorten or close the season," to which the plaintiffs refer, was subject to the approval of the Conservation Advisory Board. That restriction has been eliminated, and the present statute makes no attempt to perpetuate the biological balance fixed by the legislature. Instead, it commits directly to the Department the authority to maintain a proper balance. It says that the limits "set out in the Act are based upon a proper biological balance and shall be regulated by administrative order." Ill. Rev. Stat. 1973, ch. 56, par. 1.4.

The defendants have suggested that Administrative Order No. 78 could also be upheld under the third paragraph of section 1.4, but we find it unnecessary to pass upon that point.

The plaintiffs, in passing, challenge the defendants' action in selecting only three licensees. There can be no question but that the Department has the power to license fishermen. If the Department may validly impose a quota, as we have held it may, we see no reason why the quota may not be enforced by means of the Department's licensing power. Since the total quota is small compared with the catch in previous years, dividing it equally among the 20 fishermen that make up the industry would simply reduce the allocation below the present 10,000 pounds which the plaintiffs themselves assail as being inadequate.

So far as the selection of licensees by lottery is concerned, we view that method as a fair and practical one which the Department was entitled to employ. The defendants considered other methods such as competitive bidding or merit selection based on past performance. Such methods could present problems of their own, and they were rejected. The plaintiffs have not specified what other method of selection should have been employed, nor have they demonstrated how they

would have fared better under some alternative to the lottery.

We hold that the plaintiffs failed to make a sufficient showing of probable success at a trial on the merits, and that the judgment of the circuit court of Cook County denying the motion for a preliminary injunction must accordingly be affirmed.

*Judgment affirmed.*

MR. JUSTICE CREBS took no part in the consideration or decision of this case.